151 P.3d 1261

**STATE of Arizona, Appellee,**

v.

**Kevin M. ROSS, Appellant.**

No. 1 CA–CR 05–0200.

Court of Appeals of Arizona,
Division 1, Department A.

Jan. 30, 2007.

As Amended March 28, 2007.

Terry Goddard, Attorney General By Randall M. Howe, Chief Counsel, Cassie Bray Woo, Assistant Attorney General, Criminal Appeals Section, Phoenix, Attorneys for Appellee.

Hoidal & Hannah, P.L.C. By John R. Hannah and Martin Lieberman, P.C. By Martin Lieberman, Phoenix, Attorneys for Appellant.

## OPINION

IRVINE, Presiding Judge.

¶ 1 Kevin Ross appeals from his conviction and sentence for violating the conflict of interest prohibition of Arizona Revised Statutes ("A.R.S.") section 38–504(C) (2001). He argues that taking and using publicly available information from his own agency for his own business purposes cannot be considered using his position to secure any valuable thing or valuable benefit that is of such character as to manifest a substantial and improper influence with respect to his duties. We agree, and therefore reverse his conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶ 2 Ross served as Maricopa County Assessor from 1997 to 2004. In November 2000, Arizona enacted the Senior Property Valuation Protection Act, also known as Proposition 104. Proposition 104 was designed to protect low-income seniors from ever-rising property valuations by "freezing" a qualified taxpayer's property valuation for tax purposes. To obtain this freeze, a homeowner was required to submit an application with supporting documentation.

¶ 3 Promotional materials for the program indicated that some portion of the applicants' personal information would be kept confidential. While the bulk of the materials stated only that participants' income information would be confidential, others noted that applicant information would be kept confidential without limiting it to income. A local paper quoted Ross as stating "people don't have to worry about any information showing up on the Web or in public-disclosure documents ... [n]or is it shared with any other government agency."

¶ 4 The Assessor's office initially created a list of Proposition 104 participants in early 2001 when the office was first promoting the program. Ross made several public appearances to educate taxpayers about Proposition 104. When people approached him and asked if they were registered for the program, Ross could check the participant list.

¶ 5 In January 2003, Ross approached Colonial Mortgage Company ("Colonial") about originating reverse mortgages[1] for senior citizens. Ross filled out and signed an employment agreement with Colonial in January 2003. As Gary Graham of Colonial testified, Ross needed to complete the agreement so that Ross could earn commissions and share them with Graham.

¶ 6 Ross later gave Graham a spreadsheet containing the names and addresses of approximately 15,000 Proposition 104 participants, to be used in a direct-mail marketing campaign to sell reverse mortgages. Ross explained to Graham that while the spreadsheet contained public information, Ross could provide it in the form of a list.

¶ 7 Ross and Graham planned to split any commissions resulting from the sale of the reverse mortgages. Ultimately, their efforts did not yield a single sale and neither received any money from it. Expressing concern about his public image in March or April 2003, Ross asked Graham to stop sending out the mailings.

¶ 8 In addition to his business relationship with Ross, Graham was a contributor to Ross's re-election campaign. In February 2004, Graham gave Ross one hundred dollars for his campaign. Graham testified that his decision to make a contribution was "completely independent" of his earlier receipt of the list from Ross. Graham further testified

---

1. "A mortgage in which the lender disburses money over a long period to provide regular income to the (usu[ally] elderly) borrower, and in which the loan is repaid in a lump sum when the borrower dies or when the property is sold." Black's Law Dictionary 1033 (8th ed.2004).

that when he made the contribution, the list was virtually worthless to him.

¶ 9 In January or February of 2004, chief deputy assessor Fred Kelly obtained a CD–ROM containing the participant list of taxpayers that Ross had targeted in attempting to sell reverse mortgages. Believing that Ross was wrong to use this information for his own potential profit, Kelly delivered that CD to a tax consultant and lobbyist who served on the Property Tax Oversight Commission. The tax consultant gave the CD to a tax attorney who also served on the Commission, who in turn passed it on to the Attorney General's office.

¶ 10 The Attorney General's office contacted Kelly in February 2004. Kelly asserted that he had a conversation with Ross in February 2004 in which Ross was considering giving a new list to Colonial Mortgage if that company made sufficient campaign contributions.

¶ 11 In April 2004, Ross explained to Graham that he had political enemies who were trying to make trouble for him regarding the list. Ross asked whether Graham had the list and added that if anyone asked, Graham should act like he did not know about it. Graham replied that he no longer had it.

¶ 12 On April 28, 2004, Scott Blair, a private citizen, filed a public records request to obtain a list of 6,000 Proposition 104 participants who resided in certain zip codes. Jim Meulemans, deputy assessor of finance for the Assessor's office, was notified of the request and consulted with Ross about whether the Assessor's office should release the information. Ross told Meulemans to ask the county attorney's office whether the list should be disclosed.

¶ 13 On May 10, 2004, Meulemans followed up on his request for Deputy County Attorney Bruce White's professional opinion about whether Arizona law required the Assessor's office to designate the participants' names and addresses as confidential. White replied that Arizona statutes did not require the office to keep the participant information confidential. While the Assessor's office could argue that releasing the information would interfere with its operations, White cautioned that the courts seldom grant privacy claims that are unsupported by a specific statute. White characterized the ultimate decision as a policy call for the office.

¶ 14 Meulemans discussed White's opinion with Kelly, who typically handled public records requests. Meulemans recalled Kelly recommending that the office should refuse Blair's request and see how he responded. Meulemans also testified that when he told Kelly that Blair's attorney wanted to meet with the Assessor's office, Kelly told him to release the data. Kelly testified that Meulemans was the one who decided to disclose the data. Whoever made the decision, the Assessor's office released the records on May 24.

¶ 15 On May 27, 2004, a grand jury indicted Ross for (1) conflict of interest by disclosing confidential information in violation of A.R.S. § 38–504(B) ("count one"); (2) conflict of interest by attempting to secure a valuable benefit that would not normally accrue through an officer's official duties and that is "of such [a] character as to manifest a substantial and improper influence on the officer" in violation of A.R.S. § 38–504(C) ("count two"); and (3) obstructing a criminal investigation in violation of A.R.S. § 13–2409 (2001) ("count three").

¶ 16 The case went to trial in December 2004. After the prosecution completed its case-in-chief, the trial court granted the defense motion for a directed verdict on count one, ruling that the State failed to prove that the information was confidential. The trial court concluded, however, that count two and count three presented questions of fact that remained for the jury.

¶ 17 With regard to count two, the trial court denied the motion for acquittal because it believed there was

substantial evidence sufficient to allow the jury to return whether or not the defendant used or attempted to use his position as assessor to [secure] a valuable benefit, that is marketing and selling the list for what he and Mr. Graham hoped was separate and profitable income. There certainly is a question as to whether or not this exercise of his position to secure a valuable benefit would not ordinarily accrue to him

in his position as the assessor, and whether or not it was of such character as to be a substantial and improper influence on his performance of his official duties as county assessor.

The trial court apparently concluded that the elements of the offense would be satisfied because Ross's taking the information could be considered an official act influenced by his hope for commissions.

¶ 18 The jury convicted Ross of conflict of interest, but acquitted him of obstructing a criminal investigation. The verdict resulted in Ross immediately forfeiting his office, pursuant to A.R.S. § 38–510(B) (2001). The court denied the defense motion for a new trial. It designated the offense as a class 6 felony, placed Ross on probation for three years, and ordered Ross to pay a total of $18,000 in fines and surcharges.

¶ 19 On appeal, Ross argues that the trial court should have granted his motion for acquittal on count two because the indictment failed to allege conduct that would constitute a violation of A.R.S. § 38–504(C) and the State failed to present substantial evidence to prove that he violated § 38–504(C) beyond a reasonable doubt.[2] We have jurisdiction pursuant to A.R.S. §§ 12–120.21 (2003), 13–4031 and –4033 (2001).

### DISCUSSION

¶ 20 The central issue in this case is the scope of A.R.S. § 38–504(C). That statute states:

A public officer or employee shall not use or attempt to use the officer's or employee's official position to secure any valuable thing or valuable benefit for the officer or employee that would not ordinarily accrue to the officer or employee in the performance of the officer's or employee's official duties if the thing or benefit is of such character as to manifest a substantial and improper influence on the officer or employee with respect to the officer's or employee's duties.

Thus, the statute prohibits a public officer from (1) using or attempting to use the officer's official position to secure (2) any valuable thing or benefit (3) that would not ordinarily accrue to the officer if (4) the valuable thing or benefit is "of such character as to manifest a substantial and improper influence on the officer" (5) "with respect to [his] ... duties." *Id.* The conclusive issue for us is whether the fifth element, "with respect to his duties," includes Ross's actions.[3]

¶ 21 Generally, we review a trial court's ruling on a Rule 20 motion to dismiss "for an abuse of discretion and will reverse ... only if there is a complete absence of substantial evidence to support the charges." *State v. Carlos*, 199 Ariz. 273, 276, ¶ 7, 17 P.3d 118, 121 (App.2001). "An abuse of discretion exists when the trial court commits an error of law in the process of exercising its discretion." *Fuentes v. Fuentes*, 209 Ariz. 51, 56, ¶ 23, 97 P.3d 876, 881 (App.2004) (internal citations omitted). We review the court's statutory interpretation de novo. *State v. Gallagher*, 205 Ariz. 267, 269, ¶ 5, 69 P.3d 38, 40 (App.2003).

¶ 22 "The primary aim of statutory construction is to find and give effect to legislative intent." *UNUM Life Ins. Co. v. Craig*, 200 Ariz. 327, 329–30, ¶ 11, 26 P.3d 510, 512–13 (2001) (citing *Mail Boxes etc., U.S.A. v. Indus. Comm'n*, 181 Ariz. 119, 121, 888 P.2d 777, 779 (1995)).

Generally, if a statute is clear, we simply apply it without using other means of construction, assuming that the legislature has said what it means. When a statute is ambiguous or unclear, however, we attempt to determine legislative intent by interpreting the statutory scheme as a whole and consider the statute's context, subject matter, historical background, effects and consequences, and spirit and purpose.

*Hughes v. Jorgenson*, 203 Ariz. 71, 73, ¶ 11, 50 P.3d 821, 823 (2002) (internal quotations and citations omitted).

---

2. Ross also challenges the trial court's refusal to instruct the jury on the public records law. Because we resolve this case on the first argument, we need not reach that issue.

3. Because we decide this case on this issue, we need not address Ross's arguments that some of the other elements of the offense were not proven.

¶ 23 Our supreme court's decision in *Hughes* is instructive regarding interpretation of conflict of interest statutes. The supreme court stated that a court should not

> expand the definition of "conflict of interest" in a criminal prosecution to include conduct that does not clearly fall within the plain meaning of the statute ... as that meaning may be ascertained from the language of the statute, the interpretation of the statute by the courts of this state, or the statute's legislative history.

*Id.* at 75, ¶ 19, 50 P.3d at 825. Consequently, if a "statute is susceptible to more than one interpretation, ... doubt should be resolved in favor of the defendant." *Id.* (quoting *State v. Tarango*, 185 Ariz. 208, 210, 914 P.2d 1300, 1302 (1996)).

¶ 24 *Hughes* also shows that a criminal conflict of interest does not exist merely because a public officer acts in a way that appears to be a conflict in the eyes of the public or prosecutors. The specific terms of the statute control.

¶ 25 In *Hughes*, a county sheriff participated in some decisions concerning an investigation of possible criminal activities by his own sister. *Id.* at 72, ¶¶ 2–4, 50 P.3d at 822. The State filed several charges against the sheriff, including a conflict of interest charge under A.R.S. § 38–503(B). *Id.* at ¶ 5. The issue before the supreme court was the statute's requirement that the public officers have a "pecuniary or proprietary interest" in a decision. *Id.* at 73, ¶ 8, 50 P.3d at 823. The sheriff argued that he had no such interest. *Id.* at ¶ 10. The supreme court agreed, holding that the "interests involved in this criminal prosecution do not fall within the scope of the conflict of interest statute" and ordering the charges dismissed. *Id.* at 825, ¶ 21, 50 P.3d at 825.

¶ 26 The issue before us is similar. Did Ross's actions in obtaining and using the Proposition 104 information fall within the scope of A.R.S. § 38–504(C)'s requirement that the valuable benefit or thing manifest an improper influence with respect to his duties as Assessor?

¶ 27 "The object of conflict of interest statutes is to remove or limit the possibility of personal influence which might bear upon an official's decision." *Yetman v. Naumann*, 16 Ariz.App. 314, 317, 492 P.2d 1252, 1255 (1972). The language of A.R.S. § 38–504(C) generally applies to a public officer accepting a valuable thing or benefit that may affect or influence the public officer's vote or actions for the benefit of the donor rather than the public good. The clearest example of such a situation would be bribery, in which there is a direct and intentional link between the value given and the vote or action. *See* A.R.S. § 13–2602 (2001).

¶ 28 Section 38–504(C) goes further, however, and could include the acceptance of a gift or something of value even if there is no direct link between what is given and what is expected in return. Under section 38–504(C), neither a corrupt intent nor a quid pro quo must be proven, so long as the source and nature of the valuable thing or benefit manifests a substantial and improper influence on the officer's duties.[4]

¶ 29 The question here is what duty of the Assessor was improperly influenced? The State's original argument was that the information was confidential, so the disclosure violated both subsections (B) and (C) of section 38–504. After the trial court dismissed count one (subsection (B)), finding that the evidence did not show the information was confidential, a duty not to disclose confidential information could not be the basis for violating section (C). The State instead ar-

---

**4.** See Ohio Ethics Advisory Opinion No.2001–04, 2001 WL 694568 (Ohio Eth.Com.) at 3, which analyzes whether something of value has an "improper" influence by focusing "on the source of the thing of value." Thus, "anything of value could have an improper influence on a public official or employee if it is provided to the official or employee by a party that is interested in matters before, regulated by, or doing or seeking to do business with the public official's or employee's agency." *Id.* Consequently, in Ohio, if a public officer receives a valuable thing from someone who does business with or is regulated by the officer's agency, the thing will be "of such a character as to manifest a[n] ... improper influence." *Id.* Whether the influence is "substantial" is determined by looking to the "nature" of the thing, i.e., is it more than de minimis. *Id.* at 3–4.

gued that Ross violated the conflict of interest statute by taking the list of Proposition 104 participants without paying the fee imposed when a public record is obtained for a commercial purpose. *See* A.R.S. § 39–121.03(C) (2001).

¶ 30 Ross responds that under this analysis "a public official who wrongly takes pencils and paper from the office for use in his private business enterprise, or makes a business call on a county issued cellular phone, would be guilty of a conflict of interest." [5] In essence, Ross argues that self-interested actions by a public officer may be wrong, but they do not necessarily create a criminal conflict of interest. We agree.

¶ 31 We read the conflict of interest statute to address improper influences on a public officer's duties and actions as a public officer, not duties or prohibitions that are generally applicable to a broader group or everyone. *See, e.g., Shepherd v. Platt,* 177 Ariz. 63, 65, 865 P.2d 107, 109 (App.1993) (finding no conflict of interest by a county supervisor who was also a member of the Navajo Nation because "[t]he record ... does not demonstrate that the Navajo supervisors receive more benefits from their decisions to authorize expenditures on the reservation than any other county resident living on the reservation."). In this case, Ross had certain statutory duties regarding property assessment and classification for tax purposes. *See generally* A.R.S. §§ 11–541 to – 543 (2001); 42–12051 to –12052, –16056 (2006).[6] But the State does not argue that

he acted improperly with respect to any of these duties. It bases its case on the assertion that he committed the crime of conflict of interest through his violation of the public records law by taking public information for a commercial purpose without paying the required fee.[7]

¶ 32 That statute, however, is addressed to any "person who obtains a public record for a commercial purpose" without proper disclosure of that purpose. Public officers are not specifically mentioned. Therefore, Ross may have been prohibited from taking public information for commercial purposes without paying a fee, but that prohibition did not arise from his duties as Assessor. It arose from a general duty created by the public records law. In contrast, A.R.S. § 38–504(C) is specifically directed at influences on official duties of the public officer because of his position as a public officer.[8]

¶ 33 Consequently, we conclude that a criminal violation of A.R.S. § 38–504(C) must be based on a duty applicable to the particular public officer with respect to his office. A public officer may be guilty of theft or other similar violations if he obtains public property or information without following the rules, but the conflict of interest statute requires an action related to the officer's official duties as a public officer. To use Ross's example of taking pencils, the prohibition against taking public property, such as pencils, for personal use applies to everyone, not just the officer, so the duty not to take

---

5. Ross does not challenge the statute under the Due Process Clause of the Fourteenth Amendment as being unconstitutionally vague.

6. The 2006 version of A.R.S. §§ 42–12051 to – 12052 and –16056 is substantially similar to the 1999 version that was in effect when Ross was convicted in 2004.

7. The State also argued he failed to file a formal public records request. The evidence in this case showed that the Assessor's office made most tax information available to the public on its website and otherwise without any request, so we do not believe filing a formal request is required before an agency or officer can release public information.

8. Many statutes regulating public officers impose limitations and prohibitions that are not applicable to other persons. *See* A.R.S. § 38–444 (2001)

(prohibiting a public officer from asking for or receiving any gratuity or reward, except those authorized by law, "for doing [an] official act"); A.R.S. § 38–503 (2001) (requiring any public officer "who has, or whose relative has, a substantial interest in any contract, sale, purchase or service to ... [the] agency" to disclose the interest and refrain from participating in any decision-making regarding it); A.R.S. § 38–504(A) (limiting former officer from representing others for compensation before former agency); A.R.S. § 38–504(B) (prohibiting disclosure of confidential information); A.R.S. § 38–505(A) (2001) (barring an officer from receiving additional income "for any service rendered ... in any case, proceeding, application or other matter ... pending before the [ ] agency"). One exception is bribery under A.R.S. § 13–2602 (2001), which prohibits acts by both the payor and the payee.

pencils cannot be the basis for a criminal conflict of interest. In this case, to the extent Ross had an obligation not to take the Proposition 104 information, the obligation did not arise from his being the Assessor but from the public records law. This separate duty cannot sustain a conviction under A.R.S. § 38–504(C).

¶ 34 The State also argues that Ross was improperly influenced in his official duties because his intent to use the information in his personal business led him to instruct his staff to update the Proposition 104 list of property owners. We find this argument unpersuasive. If Ross, or Graham, had followed proper procedure and filed a public records request, the result most likely would have been the creation or updating of the list. Indeed, the Assessor's office originally created the list in 2001, before Ross came up with his reverse mortgage plan, so the list apparently served a business purpose for the Assessor's office.[9]

¶ 35 We also reject the State's implication that Ross violated A.R.S. § 38–504(C) because using information from his own agency for his own profit should almost be assumed to "manifest a substantial and improper influence" on his duties. Related to this is the State's argument that Ross violated a duty to senior taxpayers by marketing reverse mortgages to them. There is no question that, while serving as Assessor, Ross was seeking to advance his personal interests with information he obtained from the Assessor's office. Nevertheless, there was no evidence that Ross neglected his duties as Assessor or that he received a benefit that made it likely that he would neglect his duties.

¶ 36 The Assessor does not regulate mortgage brokers or solicitations for reverse mortgages. No law has been cited to us prohibiting Ross or Graham from sending solicitations for reverse mortgages, much less a law enforced by the Assessor. We are

aware of no statute or regulation that empowered or required the Assessor to limit or regulate such solicitations to any person, even to persons who took advantage of Proposition 104. As Assessor, Ross had certain duties with regard to Proposition 104 participants, such as processing the applications and recording the tax freezes, but there is no evidence in the record showing that he breached those duties.

¶ 37 For Ross to seek personal profit from information publicly available (although not widely) from his own agency may raise ethical and public record issues, but it does not violate the terms of A.R.S. § 38–504(C). Therefore, we conclude that there was a lack of substantial evidence to support count two, and the trial court should have dismissed it along with count one.

## CONCLUSION

¶ 38 For the reasons stated above, we reverse the conviction.

CONCURRING: LAWRENCE F. WINTHROP, Judge and JAMES B. SULT, Judge.

9. At oral argument, the State also argued Ross was improperly influenced in 2004 regarding his decision whether to release the information to Blair. As we understand this argument, the State is asserting that securing the valuable thing or benefit influenced Ross to try to cover up his actions. We find this argument to be without merit. The statute requires that the valuable benefit or thing be of such a character as to manifest a substantial and improper influence. Although there may have been some dispute in 2004 as to whether the information was confidential, the trial court's ruling that it was not confidential removes any possibility that the Assessor acted improperly in releasing the information. Ross may have had a guilty mind about his reverse mortgage activities, but more is required to find a violation of the statute.